**PRICE CONSTRUCTION, INC., Appellant,**

v.

**Minerva CASTILLO, Individually, and as Next Friend of Stephanie Castillo and Daisy Jovita Castillo, Minors, and as Representative of the Estate of Roberta Castillo, Deceased, Felix Castillo and Hermelinda Castillo, Appellees.**

No. 04–02–00708–CV.

Court of Appeals of Texas, San Antonio.

Feb. 18, 2004.

Rehearing En Banc Denied June 23, 2004.

Supplemental Opinion on Rehearing En Banc Sept. 29, 2004.

W. Wendell Hall, Rosemarie Kanusky, Fulbright & Jaworski L.L.P., San Antonio, Ben Taylor, Fulbright & Jaworski L.L.P., Dallas, Jose E. Garcia, Francisco R. Villarreal, Garcia & Villarreal, McAllen, for appellant.

Elizabeth Conry Davidson, Curtis L. Cukjati, Martin & Cukjati, L.L.P., Scott P. Jones, Jones, Rogers & Navarro, P.C., Nissa M. Sanders, Crofts & Callaway, P.C., Ricardo R. Reyna, Stephen D. Navarro, Brock & Person, P.C., Timothy R. Price, Price Law Firm, Kimberly S. Keller, Keller Group, San Antonio, Jose J. Ruiz, Ruiz & Associates, Eagle Pass, Elizabeth Conry Davidson, Alamo Heights, for appellees.

Alberto M. Ramon, Law Office of Alberto M. Ramon, Eagle Pass, for ad litem.

Sitting: SARAH B. DUNCAN, Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

Opinion by PHYLIS J. SPEEDLIN, Justice.

In eleven issues, Price Construction, Inc.("Price") appeals from a judgment in favor of plaintiffs, Minerva Castillo, individually, and as next friend of Stephanie Castillo and Daisy Jovita Castillo, minors, and as representative of the estate of Roberto Castillo, Felix Castillo, and Hermelinda Castillo (collectively, the "plaintiffs"). We reverse and render judgment that the plaintiffs take nothing.

## BACKGROUND

The Texas Department of Transportation ("TxDOT") contracted with Price to perform road improvements on a 2.25–mile section of Highway 277 in Eagle Pass, Texas. Price was responsible for maintaining traffic control devices in the construction area. On August 20, 2000, at approximately 10:15 p.m., Roberto Castillo ("Castillo") was driving north on Highway 277, while Carol Sunderland ("Sunderland") was driving south. Their vehicles collided head-on. As a result, Castillo died on impact. Sunderland received a severe head injury and has no memory of the accident.

Following Castillo's death, the plaintiffs sued Price, Sunderland, Flasher Ltd.("Flasher"), and Banner Sign & Barricade, Inc. ("Banner Sign & Barricade"). Before the plaintiffs rested their case at trial, the court granted Flasher's motion

for directed verdict on all of the plaintiffs' claims. As to their claim against Sunder-, land, the plaintiffs settled with her prior to the conclusion of trial. Furthermore, the plaintiffs' claim against Banner Sign & Barricade as subcontractor for Price was severed and separately appealed.[1] The trial ended with a verdict in favor of the plaintiffs, although the jury apportioned twenty percent of the liability to Castillo with the remaining eighty percent attributed to Price. The jury awarded $6,000 to Minerva on behalf of Roberto Castillo and $1.2 million to her in past and future damages; $1 million each to Stephanie and Daisy in past and future damages; $150,000 to Felix in past and future damages; and $150,000 in past and future damages to Hermelinda. Price appeals the judgment.

## STANDARD OF REVIEW

In its first two issues, Price asserts that the evidence is legally and factually insufficient to support the jury's findings that Price had actual knowledge of an unreasonably dangerous condition that proximately caused Castillo's accident. Because we conclude the evidence is legally insufficient on the element of Price's actual knowledge, we do not reach the issue of factual sufficiency.

■ "A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

## PREMISE LIABILITY CLAIM AS A LICENSEE

■ Price maintains that the plaintiffs did not meet their burden of proof in establishing Price's liability because there is legally insufficient evidence that Price had actual knowledge of an unreasonably dangerous condition that proximately caused Castillo's death. The proof of a premises liability claim is dependent on the status of the plaintiff who enters the land. *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1, 3 (Tex.1996) (per curiam). The trial court submitted this case to the jury under the legal theory that Castillo was a licensee. Neither party on appeal challenges the submission of the case on the licensee theory or the definition of a licensee in the jury charge. Accordingly, this case was submitted under the theory that Price had a duty not to injure Castillo by willful, wanton, or grossly negligent conduct and to use ordinary care either to warn Castillo of, or to make reasonably safe, a dangerous condition of which Price was aware and Castillo was not. *State Dep't of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex.1992). It was undisputed that Price did not injure Castillo by willful, wanton, or grossly negligent conduct. Therefore, in order to prevail, the plaintiffs were required to establish: (1) the condition of the premises posed an unreasonable risk of harm to Castillo; (2) Price had actual knowledge of the defective condition; (3) Castillo had no knowledge of the defective condition; (4)

---

1. *See Banner Sign & Barricade, Inc. v. Price Constr. Inc.*, 94 S.W.3d 692 (Tex.App.-San Antonio 2002, pet. denied).

Price failed to exercise ordinary care to protect Castillo from danger; and (5) such failure was a proximate cause of injury to Castillo. *Id.*

### 1. Unreasonable Risk of Harm

The plaintiffs assert that the construction site posed an unreasonable risk of harm to Castillo. At trial, the plaintiffs offered a variety of TxDOT inspection reports and photographs along with the testimony of inspector Raul Flores revealing Price had been cited for various deficiencies at different times and sections of the construction zone prior to the accident. The plaintiffs also called numerous witnesses, including Melva DeHoyos ("DeHoyos"), David Steitle ("Steitle"), John Mounce ("Mounce"), and Police Chief Juan Castaneda ("Chief Castaneda").

DeHoyos testified she was driving north on Highway 277 at approximately thirty to thirty-five miles per hour immediately prior to the accident. Highway 277 consisted of three lanes at the time, one lane going south and two lanes going north. There had been at least three lane changes over the course of construction on Highway 277 and DeHoyos had, on several occasions, become confused. She was also confused on the night of the accident because she could not see clear markings in the road showing her lane. DeHoyos further testified that on the night of the accident she observed Castillo driving one to two car lengths behind her with his headlights on and never saw him change lanes, swerve, drive erratically, or lose control of his vehicle. Castillo did not try to pass her, speed up, tailgate, or flash his lights at her. As DeHoyos approached the intersection of Church Street, she moved into the right hand northbound lane about a block before the intersection. As she approached the intersection, she slowed down because the road curved and the traffic light was red.

Castillo did not pass her, but came even with her driver's side passenger door. When the light turned green, DeHoyos accelerated. As she did so, she saw a pickup truck approaching her from the opposite direction, driving south in the "middle" lane, or the lefthand northbound lane. She remembers moving slightly to the right to avoid the oncoming truck. Seconds later, DeHoyos heard a bang next to her. She pulled her car over and saw that Castillo's and Sunderland's trucks had collided in the "middle" lane.

Steitle, a traffic engineer, was called as the plaintiffs' accident reconstructionist. He testified that he reviewed the testimony of various witnesses, photographs, responses to discovery, the accident report, and the accident site itself. Based on this information, it was his opinion that Castillo was traveling northbound and Sunderland was traveling southbound immediately prior to the accident. They collided head-on at a location within Castillo's northbound lane of traffic. Sunderland would have been negotiating a curve in her travel path up to the point of impact. There was no evidence of evasive maneuvers on the part of either driver. Steitle further testified that photographs taken at the scene of the accident showed that almost all of the reflective plastic pavement markers dividing the lanes of travel, especially the center line divider, were missing.

Mounce, a civil engineer specializing in transportation, also testified as the plaintiffs' expert. He opined that based on the information he had reviewed, the accident was a head-on collision that occurred in Castillo's lane of travel, and was caused by Sunderland ending up in the wrong traffic lane because she was confused by the traffic control devices. He noted that a contractor such as Price is required to effect a traffic control plan for a construction project. The intent of the traffic control plan

is to afford the motorist positive guidance through the construction zone. It is important, especially at night, to use reflective devices or other types of external lighting to guide a driver safely through the construction zone. Mounce criticized Price for failing to adequately maintain positive guidance leading up to the area where this accident occurred. Specifically, he testified that in the southbound approach to the intersection, the center line, which was defined with raised pavement markers, had many of those markers missing. This would have diminished a driver's ability to define the center line. Additionally, because one of the original two southbound lanes had temporarily been closed, the contractor was required to define the new southbound edge of the roadway by paint or buttons. Photos taken the day after the accident, however, did not show a visible southbound edge line, possibly because the paint or buttons were covered by dirt or gravel. The need for an edge line is especially important to a driver who cannot see the center line because of missing buttons or because the headlights from oncoming cars inhibit the driver's visibility. In such a case, the driver would need guidance from the edge of the roadway through the construction zone. When the edge line is missing or covered by dirt, it creates an unsafe situation. Furthermore, the old center line marking was still visible because of the reflective paint, although it should have been obliterated when one of the two southbound lanes was temporarily closed. Mounce stated this additional hazard also had the potential to mislead or confuse a driver traveling in the southbound lane.

Chief Castaneda testified he was familiar with the accident site and drove through the intersection on a daily basis before the accident. In his opinion, driving at night through the construction site was dangerous because of the lack of visibility. He also considered driving through the construction site during the day to be a problem because of the heavy traffic on Highway 277. On more than one occasion, he instructed one of his officers to tell "whoever was in charge there" to clean the barricades and drums because they were difficult to see at night due to the accumulation of dirt. Chief Castaneda also testified that there had been a pre-construction meeting between TxDOT and "several people" where they discussed the start date for the project, problems that might arise, and when the work would be completed. At that meeting, he expressed a general concern about the lack of police officers directing traffic at the construction site.

Because of our disposition on the second element of the plaintiffs' claim, we need not decide whether the evidence is legally sufficient to prove that, at the time of the accident, an unreasonable dangerous condition existed in the southbound approach to the intersection where the accident occurred.

## 2. Actual Knowledge of the Dangerous Condition

■ To meet the second element of their premises defect claim, the plaintiffs were required to prove that Price had actual knowledge of an unreasonable dangerous condition at the accident site. As noted, Mounce testified the lack of reflective buttons clearly delineating the center lane, combined with the presence of the old center line reflective paint markings and the lack of a well-defined road edge, contributed to create an unreasonable risk of harm at night for a southbound driver attempting to stay in her own lane of traffic through the construction zone. Assuming without deciding that an unreasonable dangerous condition existed, we must determine next whether the evidence is

legally sufficient to prove Price had actual knowledge of the dangerous condition.

■ Actual knowledge is what a person actually knows as distinguished from constructive or imputed knowledge; that is, what a person does not actually know, but should know or have reason to know. *State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974)(duty to warn licensee of dangerous condition arises only when licensor has actual, not constructive, knowledge of the condition); *Keetch v. Kroger Co.,* 845 S.W.2d 262, 265 (Tex.1992) (proof that a person created the condition does not establish his awareness of it as a matter of law).

The plaintiffs introduced into evidence a series of TxDOT inspection reports from the fall of 1999 to August 15, 2000 which detailed specific deficiencies for the entire 2.25–mile construction project. In multiple reports, Price was cited for dirty barricades, vertical panels, and plastic drums; missing warning lights at the end of the construction zone, as well as a missing barricade; lights and flashers that did not work; and barrels and drums that were knocked down. None of the inspection reports dealt specifically with the southbound curve criticized by both Steitle and Mounce or the intersection where this accident occurred. None of the inspection reports noted missing buttons in the center lane of traffic, the presence of the old center line reflective paint markings, or poorly maintained edge markings because of accumulated dirt and gravel. In sum, the numerous inspection reports do not show that Price had actual knowledge of the dangerous condition cited by the plaintiffs' experts as causing this collision. Moreover, there was no evidence Price failed to correct deficiencies that had been cited by TxDOT in the inspection reports. It is noteworthy that the day after the accident, TxDOT again inspected the entire construction zone and found all required traffic control devices present, and the closure of the one southbound lane to be in accordance with their plans. Neither the jury nor this court can make a determination from the inspection reports that Price had actual knowledge of the three deficiencies cited by the plaintiffs' experts as causing this accident, either individually or collectively.

Additionally, no one testified that Price had been told about the claimed dangerous conditions in the southbound lane of traffic near the intersection where Castillo and Sunderland collided. There was no evidence of previous collisions at or near this intersection. Steitle and Mounce, the plaintiffs' two experts, testified the construction site posed an unreasonable risk of harm to Castillo and Sunderland. They did not, and could not, testify that Price knew of the problems and an unreasonable risk of harm. While Chief Castaneda testified he had a pre-construction meeting concerning the general safety of the site, there was absolutely no evidence that Chief Castaneda's concerns were brought to Price's attention or that his concerns dealt with the specific intersection at issue in this case. In addition, while Chief Castaneda testified that he instructed one of his officers to tell "whoever was in charge there" to clean the barrels, there is no evidence that person ever spoke to a Price representative before the accident. The plaintiffs' experts and other witnesses did not testify that dirty barrels caused this accident. Even when viewed in the light most favorable to the plaintiffs, the evidence is legally insufficient to support the jury's finding of actual knowledge by Price.

CONCLUSION

Because the evidence is legally insufficient to support the jury's finding of

Price's actual knowledge of an unreasonably dangerous condition, we reverse and render judgment that the plaintiffs take nothing on their claim against Price. Therefore, we do not address Price's remaining issues on appeal because they are not necessary to the final disposition of this appeal. *See* Tex.R.App. P. 47.1. Additionally, we affirm the portion of the judgment ordering that the plaintiffs take nothing on their claims against Flasher.

Rehearing en banc denied.

STONE, Justice, dissenting to denial of motion for reconsideration en banc.

I respectfully dissent from the denial of the appellees' motion for reconsideration en banc. I believe the majority opinion misapplies both the applicable standard of review and the law.

In considering a legal sufficiency challenge, we consider only the evidence favorable to the decision of the trier of fact, and we disregard all evidence and inferences to the contrary. *See Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Wal–Mart Stores, Inc. v. Garcia,* 30 S.W.3d 19, 21 (Tex.App.-San Antonio 2000, no pet.). If more than a scintilla of evidence supports the jury's finding, the legal sufficiency challenge fails. *See Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983); *Garcia,* 30 S.W.3d at 21. Appellate courts are required to consider the evidence and inferences as they tend to support the verdict. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 228 (Tex.1990).

In holding that the evidence is legally insufficient to support the jury's finding that Price had actual knowledge of an unreasonably dangerous condition at the accident cite, the majority cites only a portion of the Texas Supreme Court's holding in *Keetch v. Kroger Co.,* 845 S.W.2d 262, 265 (Tex.1992). The portion of the *Keetch* decision cited by the majority recognized that creating a condition that poses an unreasonable risk of harm does not establish knowledge as a matter of law. *See id.* at 265–66. The portion of the *Keetch* decision that the majority fails to recognize, however, is that a jury is entitled to draw an inference of actual knowledge from evidence that a defendant created the condition. In analyzing *Coffee v. F.W. Woolworth Co.,* the Texas Supreme Court acknowledged in *Keetch,* that the defendant's creation of the condition "was circumstantial evidence of knowledge." 845 S.W.2d at 265–66 (citing *Coffee v. F.W. Woolworth Co.,* 536 S.W.2d 539 (Tex. 1976)); *see also Richardson v. Wal–Mart Stores, Inc.,* 963 S.W.2d 162, 165 (Tex. App.-Texarkana 1998, no pet.) (recognizing that if owner/operator created a condition that posed an unreasonable risk of harm, that fact alone could authorize a jury to find an inference of knowledge); *Mitchell v. City of Dallas,* 855 S.W.2d 741, 749 (Tex.App.-Dallas 1993), *aff'd,* 870 S.W.2d 21 (Tex.1994) (same).

In an unpublished opinion, the Dallas court applied this permissible inference rule in a construction context. *See Total Petroleum, Inc. v. Cater,* No. 05–98–00702–CV, 2000 WL 1048510, at *4 (Tex.App.-Dallas July 31, 2000, pet. denied) (not designated for publication). In that case, the court noted that the plaintiff showed that the defendant "authorized the construction work and permitted and maintained the construction area in such a manner that cement dust and other debris was deposited on the walkway. This alone is sufficient evidence to charge [the defendant] with knowledge of the dangerous condition on the walkway." *Id.* The court concluded, "Knowledge of the dangerous condition may be inferred from [the defendant's] role in creating the hazard."

In this case, Price's superintendent admitted that Price was responsible for en-

suring that all of the traffic control devices were not confusing to the average motorist. The appellees' expert testified that Price was responsible for providing and maintaining positive guidance for drivers.

Several witnesses testified that the lanes at the accident site were not properly marked or that there were no markers of any kind. Melva de Hoyos, who was driving beside Castillo immediately before the accident, testified that she had difficulty during the construction process determining which lane she was supposed to drive in because the lanes kept changing. De Hoyos stated that she did not see clear markings in the road to show where the lanes were supposed to be. De Hoyos stated that she was even unable to determine from pictures taken the day after the accident where the lanes were. De Hoyos did not see any barrels or vertical panels separating the lanes. Another witness, Santiago de la Garza, stated that the lanes were not clearly marked and "there were no markers or any kind of indication for [him] to know" where the lanes were. Police Chief Juan Antonio Castañeda also testified that the markings were insufficient, stating, "And 'markings,' I'm referring to the yellow striping—the white striping or do not pass or double yellow line, and now they're accustomed to putting the reflector buttons, amber-colored lights, you put on the highway, you know. I didn't see any of those, the reflector buttons." Furthermore, the investigation report prepared by the Texas Department of Public Safety ("DPS") lists "center stripe or divider" as a traffic control factor that contributed to the accident. The investigating officer, Trooper Marvin Richardson, gave a statement in which he stated, "Because, like I said, there was really no—no marking out there as far as designating the lane." Even Price's superintendent admitted that the old painted yellow center line had not been "obliterated" as it

should have been. Finally, the appellees' expert testified that Price failed to place reflective buttons designating the center line and failed to provide markings to establish the road edge. In addition to this testimony, the jury had pictures of the accident site taken the day after the accident from which the jury could determine whether the traffic control devices were adequate.

Because Price was solely responsible for providing and maintaining the traffic control devices, Price created the dangerous condition by failing to provide and maintain adequate lane markings. Accordingly, the jury was entitled to infer that Price had actual knowledge of the condition it created.

Viewing the evidence and inferences in the light most favorable to the jury's verdict, and disregarding all contrary evidence and inferences, Price was responsible for creating the inadequate lane markings, and the jury was permitted to infer that Price had actual knowledge of the condition it created. Because the majority holds to the contrary and fails to grant the appellees' motion for reconsideration en banc, I respectfully dissent.

## SUPPLEMENTAL OPINION ON MOTION FOR EN BANC CONSIDERATION

Opinion by PHYLIS J. SPEEDLIN, Justice.

The motion for rehearing en banc filed by the attorney ad litem for the two minor children of the appellee Minerva Castillo is granted. Our opinion dated February 18, 2004, is supplemented with this opinion addressing the issue of the attorney ad litem's fee. We withdraw our judgment dated February 18, 2004, and issue a new judgment reversing and rendering judgment that the appellees take nothing on

their claim against Price Construction, Inc., and affirming the portion of the judgment ordering that appellees take nothing on their claims against Flasher Ltd. Additionally, we reverse and remand the award of $55,298 in attorney ad litem fees to the trial court for further proceedings.

■ The issue of the attorney ad litem's fee was not addressed in the court's opinion issued February 18, 2004, because the trial court's judgment was reversed in favor of Price on the issue of liability; thus, as the prevailing party on appeal, Price is not required to pay the trial court costs, which include the $55,298 ad litem fee. *See* Tex.R. Civ. P. 131, 139. After the trial court's judgment in favor of the Castillo family was reversed, the attorney ad litem for Castillo's minor children submitted a document entitled "Attorney Ad Litem's *Pro Bono Amicus Curiae* Brief in Support of Minor Children's Interest Under Umbrella of Appellees' Motion for Reconsideration En Banc." The brief requests affirmative relief on behalf of the ad litem in that it requests that Price be ordered to pay all or part of the ad litem fee. As stated in our order dated June 11, 2004, the brief is being treated as a separate motion for rehearing en banc filed by the ad litem. The ad litem's motion for rehearing was filed while the appellees' motion for reconsideration en banc was pending[1] before the court; thus, the court has plenary jurisdiction over the ad litem's motion. *See* Tex.R.App. P. 19.1(b); *see also Yzaguirre v. Gonzalez*, 989 S.W.2d 111, 112–113 (Tex.App.-San Antonio 1999, pet. denied) (en banc) (motion for en banc review may be filed at any time within the period in which the court of appeals retains plenary power).

This supplemental opinion on rehearing is being issued to address: (1) whether the judgment awarding the attorney ad litem fee is void as alleged by Price on appeal; and (2) if not, whether "good cause" exists under Texas Rule of Civil Procedure 141 to assess any portion of the ad litem fee against Price, the prevailing party on appeal. *See* Tex.R. Civ. P. 139, 141.

### 1. Validity of Judgment Awarding Ad Litem Fee.

■ Price argued in its appellant's brief that the judgment awarding the attorney ad litem fee of $55,298 is void because it is styled as a "judgment nunc pro tunc," but does more than merely correct a clerical error in the original judgment; it adjudicates and assesses the ad litem fee as additional court costs. The purpose of a judgment nunc pro tunc is to correct a clerical error in the judgment after the trial court's plenary power has expired. Tex.R. Civ. P. 316, 329b(f); *see Jenkins v. Jenkins*, 16 S.W.3d 473, 482 (Tex.App.-El Paso 2000, no pet.). Because the second judgment was signed within the trial court's plenary power,[2] it is construed as a valid modified judgment even though it is misnamed as a judgment "nunc pro tunc." *Mathes v. Kelton*, 569 S.W.2d 876, 878 (Tex.1978) (even if the court mistakenly

---

**1.** Appellees' motion for rehearing en banc was timely filed on April 13, 2004, and was denied on June 23, 2004.

**2.** The original judgment was signed on July 11, 2002. The trial court's plenary power was extended by the timely filing of a motion for new trial by Price, which was denied by written order on September 16, 2002. While the motion for new trial was still pending, the ad litem filed a motion for payment of his fee, which was granted by written order. On September 23, 2002, within thirty days after denial of the motion for new trial, the court signed a modified judgment (styled a "judgment nunc pro tunc") awarding the $55,298 ad litem fee as court costs. Therefore, the judgment was modified within the trial court's plenary power. *See* Rule 329b(e), Tex.R. Civ. P.

names the second judgment a "judgment nunc pro tunc," the judgment is not a judgment nunc pro tunc, but is a modified judgment); *see also Alford v. Whaley*, 794 S.W.2d 920, 922 (Tex.App.-Houston [1st Dist.] 1990, no writ) (if the court signs a corrected judgment during the time it still has plenary jurisdiction, it is a modified judgment, not a judgment nunc pro tunc); *Go Leasing, Inc. v. Groos Nat'l Bank*, 628 S.W.2d 143, 144–45 (Tex.App.-San Antonio 1982, no writ).

■ Price also argued in its appellant's brief that the judgment awarding the ad litem fee is a nullity because it fails to recite that the prior judgment is vacated. Any change in a judgment made during the trial court's plenary power is treated as a modified or reformed judgment that implicitly vacates and supercedes the prior judgment, unless the record indicates a contrary intent. *Owens–Corning Fiberglas Corp. v. Wasiak*, 883 S.W.2d 402, 410–11 (Tex.App.-Austin 1994, no writ). Here, the record indicates that the second judgment was intended to vacate the first judgment. The second judgment repeats the exact same language as the first judgment, with the only differences being the assessment of the ad litem fee as costs and the erroneous title of "final judgment nunc pro tunc," indicating that it was intended to modify and replace the prior judgment. *See City of West Lake Hills v. State*, 466 S.W.2d 722, 726 (Tex.1971); *Exxon Corp. v. Garza*, 981 S.W.2d 415, 419 (Tex.App.-San Antonio 1998, pet. denied) (if the record shows an intent to vacate, the second judgment need not expressly state that the first judgment is vacated, although that is the preferable practice). Therefore, the

second judgment awarding the attorney ad litem fee vacated the prior judgment and is a valid modified judgment.

### 2. Existence of "Good Cause" to Assess Costs Against Prevailing Party.

■ The attorney ad litem argues that "good cause" exists under Rule 141 to assess the ad litem fee, taxed as court costs, against Price even though Price is the prevailing party on appeal. *See* Tex.R. Civ. P. 141. The only reason cited by the ad litem as "good cause" is the inability of the minors and Castillo to pay the $55,298 ad litem fee. The ad litem asserts that it is unfair to make the Castillo family pay the fee because they do not have the resources, and it is equally unfair for the ad litem not to be compensated for services rendered. The ad litem acknowledges that the record contains no evidence regarding the ability to pay by the minors or Castillo, and the trial court has made no finding of their inability to pay the ad litem fee. Nevertheless, the ad litem argues that the appellees' inability to pay is obvious and well known to the trial court and to Price. The ad litem urges this court to assess the $55,298 fee against Price,[3] or alternatively, to remand the issue to the trial court for a determination of the Castillo family's ability to pay and whether "good cause" exists to assess all or part of the fee against Price.

The Texas Supreme Court has stated that "good cause" to tax court costs against the prevailing party is an elusive concept that must be determined on a case-by-case basis. *Rogers v. Walmart Stores, Inc.*, 686 S.W.2d 599, 601 (Tex.

---

**3.** The attorney ad litem argues that this court should render judgment assessing the ad litem fee against Price based on good cause. Texas Rule of Appellate Procedure 43.4, however, authorizes us to tax the *appellate* costs, including the costs for the clerk's record and

reporter's record, against the prevailing party if warranted by good cause. Tex.R.App. P. 43.4. The ad litem's fee is not taxed as a cost of appeal, but as a cost of the trial court which falls within Rule 141. *See* Tex.R. Civ. P. 141.

1985). "Typically . . ., 'good cause' has meant that the prevailing party unnecessarily prolonged the proceedings, unreasonably increased costs, or otherwise did something that should be penalized." *Furr's Supermarkets, Inc. v. Bethune,* 53 S.W.3d 375, 377 (Tex.2001); *see, e.g., Rogers,* 686 S.W.2d at 601 (affirming taxation of costs against successful party based on trial court's finding that party's trial strategy unnecessarily prolonged the trial); *Tex. Dep't of Transp. v. Pirtle,* 977 S.W.2d 657, 658 (Tex.App.-Fort Worth 1998, pet. denied) (affirming assessment of costs against Department of Public Safety where it refused to mediate as ordered, and failed to file any objection to mediation). The argument that a losing party's inability to pay court costs alone constitutes "good cause" for taxing all or part of the costs against the successful party has been rejected by the Supreme Court, although not in the context of ad litem fees. *See Furr's,* 53 S.W.3d at 378 (holding that a party's inability to pay court costs was not "good cause" under Rule 141). "If financial inability to pay was 'good cause' then, contrary to rule 131, the winner—not the loser—of a lawsuit would often be in a better position to pay the costs." *Id.* (quoting *Adams v. Stotts,* 667 S.W.2d 798, 801 (Tex.App.-Dallas 1983, no writ)).

In the specific context of ad litem fees taxed as costs, the attorney ad litem cites two cases in support of his argument that the minors' inability to pay justifies taxing the ad litem fee against Price. In *Davis v. Henley,* 471 S.W.2d 883 (Tex.App.-Houston [1st Dist.] 1971, writ ref'd n.r.e.), the appellate court affirmed taxation of a $900 guardian ad litem fee against the successful defendant based on the trial court's finding after a hearing that neither the minor nor his father had funds to pay the fee. The appellate court held that, upon concluding that the minor plaintiff and his father could not pay the ad litem fee, the trial court was entitled to consider the following factors in determining "good cause" to assess the fee against the successful defendant: (1) the importance of the minor plaintiff having competent counsel who should be reasonably sure of receiving a fee for his services; (2) that a prevailing defendant also benefits from the ad litem's services because it ensures that a judgment adverse to the minor will not be overturned for lack of a guardian ad litem; and (3) whether the record shows that the minor plaintiff's claim was frivolous. *Davis,* 471 S.W.2d at 885. The court in *Davis* concluded that the plaintiff's claim was not frivolous, the defendant also benefitted from the ad litem's appointment, the ad litem was entitled to be paid for his services and the minor plaintiff and his father could not pay the fee; therefore, the court found "good cause" under Rule 141 to tax the fee against the prevailing defendant. *Id.* (citing *Bruni v. Vidaurri,* 140 Tex. 138, 166 S.W.2d 81 (1942), for the general rule that " . . . the fee for representing a minor defendant should be taxed against the minor personally served with citation when the judgment . . . is unfavorable to him and it is shown that he has property . . . , but that when the minor has no property or estate . . . , the court should charge it against the successful plaintiff").

In the other case cited by the ad litem, the appellate court reversed the assessment of the guardian ad litem fee against the prevailing defendant because the minor plaintiffs had the ability to pay the ad litem fee out of settlement proceeds received from other defendants. *See Dover Elevator Co. v. Servellon,* 876 S.W.2d 166 (Tex.App.-Dallas 1993, no writ) (holding that plaintiffs could not create an inability to pay by placing settlement funds into an annuity to avoid paying the ad litem fees). The court stated, however, that *if* the record had shown *both* that the plaintiffs were

unable to pay the fees *and* that the defendant benefitted from the ad litems' services, it would have found "good cause" to assess the ad litem fees against the defendant. *Dover*, 876 S.W.2d at 170; *see also Dallas Area Rapid Transit v. Williams*, No. 05–96–01485–CV, 1998 WL 436917 at *3–4 (Tex.App.-Dallas 1998, pet. denied) (not designated for publication) (affirming portion of judgment taxing guardian ad litem fees against DART as prevailing party based on the plaintiffs' inability to pay). The *Dover* court stressed that the benefit a prevailing defendant receives from an ad litem's appointment protecting a favorable judgment cannot alone establish "good cause" under Rule 141. *Dover*, 876 S.W.2d at 171 (stating "[i]f this benefit to Dover, alone, constituted good cause, guardian ad litem fees could always be assessed against a prevailing defendant"). Finally, the *Dover* court stated its support for the policy that those who accept ad litem appointments should be reasonably sure of receiving a fee for their services. *Id.* (citing *Cahill v. Lyda*, 826 S.W.2d 932, 933 (Tex. 1992)).

Finally, the ad litem argues that it would not be "fair" to force the minor plaintiffs or Castillo to pay the ad litem fee. The Texas Supreme Court recently rejected a fairness argument made as the "good cause" reason to split the guardian ad litem fee between the defendant physician and the parents in a medical malpractice case. *See Roberts v. Williamson*, 111 S.W.3d 113, 124 (Tex.2003). The trial court had found that "because an ad litem is there for the benefit of all the parties, it is 'fair' to split costs between the losing and prevailing parties." *Id.* The Supreme Court reiterated that a guardian ad litem does *not* serve for the benefit of all parties, but, rather, serves to protect the minor's interests. *Id.* (citing *Am. Gen. Fire & Cas. Co. v. Vandewater*, 907 S.W.2d 491, 493 n. 2 (Tex.1995)). The Supreme Court

noted the trial court's finding of good cause was premised on its perception that the prevailing party incidentally benefitted from the ad litem's services. The court stated, "[a]ssuming that such an incidental benefit might in a particular case provide good cause, Rule 141 still requires that the trial court state its reasons 'on the record' and with more specificity than the court's general notion of fairness [stated] here." *Id.* (holding grounds of perceived fairness, without more, are insufficient to constitute good cause). The Supreme Court did not rule out the possibility that fairness may be good cause, but stated the record must substantiate the reasoning. *Id.*

*Conclusion.*

Generally, the trial court costs, including an ad litem fee, should be taxed against the plaintiff when the defendant prevails on appeal. *See* TEX.R. CIV. P. 131, 139. Because the attorney ad litem has raised an argument that "good cause" exists to assess all or part of the ad litem fee against Price, and the record contains no evidence on this issue, we reverse the award of ad litem fees and remand to the trial court for an evidentiary hearing and ruling to determine: (1) whether the minor or adult plaintiffs have the ability to pay the ad litem fee; and (2) if not, whether good cause exists under Rule 141 to tax all or part of the ad litem fee against Price as the prevailing party. *See* TEX.R. CIV. P. 141. The attorney ad litem's motion for rehearing en banc is granted.

Concurring opinion by CATHERINE STONE, Justice, joined by ALMA L. LÓPEZ, Chief Justice.

I concur in the Supplemental Opinion which remands the cause to the trial court for consideration of the award of ad litem fees because I believe the ad litem should serve with reasonable assurance of payment for services rendered. This concur-

444

rence, however, does not change my previously expressed dissent from the denial of the appellees' motion for reconsideration en banc.